BENNIE ARQUILLA AND WIFE JULIE ARQUILLA, HERBERT L. BAKER AND WIFE GRACE P. BAKER, DAVID M. BENNETT AND WIFE MELANIE H. BENNETT, RONALD BOST AND WIFE MARTHA BOST, ROBERT J. BRUNORY AND WIFE NAN W. BRUNORY, BOB BURGES AND WIFE SHARON BURGES, EUGENE K. CLARY AND WIFE SUE H. CLARY, RANDY L. COX AND WIFE MARY A. COX, PAUL DZIEZYC AND WIFE KATHERINE DZIEZYC, GORDON L. EDDY AND WIFE TERESA EDDY, RICHARD T. FONTENOT AND WIFE DONNALEE FONTENOT, ROBERT W. GARNER AND WIFE JULIE S. GARNER, SUZANNE R. GODRIDGE, GLENN R. HARRISON AND WIFE MARY J. HARRISON, DARLENE BARROW HARTMAN, CARROLL BRUCE HAWKINS AND WIFE KAREN HAWKINS, DENNIS D. HINZ AND WIFE DOROTHY C. HINZ, JERRY L. HOLDER AND WIFE BRENDA S. HOLDER, HONG BICH VAN LE AND WIFE CAM HONG THI DO LE, DOUGLAS H. JONES AND WIFE MELODY T. JONES, J. STEVEN LAND AND WIFE JAYNE H. LAND, CARL C. LYERLY, SR. AND WIFE MARGARET C. LYERLY, CLARA R. LAZARO, JOHN K. MILLER AND WIFE CAROL K. MILLER, WILLIAM MILLER AND WIFE KATHERINE MILLER, DOROTHY MISENHEIMER, ROBERT R. MOORE AND WIFE GAY P. MOORE, TIMOTHY L. NOONER AND WIFE CYNTHIA C. NOONER, JANET T. PARKER AND HUSBAND RICK PARKER, STEVE POTEAT AND WIFE DONNA POTEAT, JOHN R. PRING AND WIFE LAURA W. PRING, KENT RABON AND WIFE MARISA W. RABON, WARREN S. REYNOLDS AND WIFE RITA H. REYNOLDS, JOHN RUSS AND WIFE KIM RUSS, ALEX SCOTT, STEPHAN F. SHERRIFF AND WIFE NANCY S. SHERRIFF, FLOYD JOHN WALCHER AND WIFE JOE ELLEN DAVIS WALCHER, LINNE WALLACE AND HUSBAND CHARLIE JAMES WALLACE, JR., ANDREW E. WHITTED AND WIFE ANNETTE E. WHITTED, DANIEL H. WILLIFORD AND WIFE MELINDA S. WILLIFORD, JOHN W. WILLIAMS AND WIFE PATTY P. WILLIAMS, CARL RAY YATES AND WIFE DELLA FAYE YATES, JAMES D. CUSAK, JILL DUGGAN, SCOTT GASKILL AND WIFE KAREN GASKILL, JERRY MILEM AND WIFE SHIRLEY MILEM, ROBERT MORGAN AND WIFE ELIZABETH MORGAN, JOHN NOONAN AND WIFE LISA NOONAN, CHARLES R. REED AND WIFE GENEVIEVE B. REED, MARK RITCHIE AND WIFE JANE RITCHIE, DANNY THORNTON, JESSE C. EBERSOLE AND WIFE LISA M. EBERSOLE, WALLACE J. ELSTON, JR. AND WIFE ARLINE A. ELSTON, ALLEN R. AREY AND WIFE RUBY L. AREY, MARVIN A. BURNETT AND WIFE HAZEL H. BURNETT, YU CHIN CHOI AND WIFE HYUNG K. CHOI, JEFF DINSE, VIOLA H. DIXON, JOHN M. DURKEE AND WIFE JOYCE G. DURKEE, MARTHA S. FREEZE AND HUSBAND MICHAEL A. FREEZE, JOHEPH P. GREEN AND WIFE ANNA GREEN, LETTY KELLY, MOSES LANDRUM AND WIFE GEORGIA LANDRUM, DORIS D. MASTERS, WALTER GRADY MORRIS, BARBARA A. NANCE AND HUSBAND CLARENCE V. NANCE, OLD CAROLINA BRICK CO., JACK B. RICHARDSON AND WIFE MANIE G. RICHARDSON, RALPH SHATTERLY AND WIFE SHARON SHATTERLY, KENNETH W. SHEPLER AND WIFE NAOMI G. SHEPLER, RANSOM A. SHUPING AND WIFE PAULINE L. SHUPING, MICHAEL SOMMERS AND WIFE JOANNE SOMMERS, CHARLES F. VASCONCELLOS AND WIFE LAURIE VASCONCELLOS, ROBERT H. WADDELL AND WIFE ALICE WADDELL, LARRY DEAN WAGONER AND WIFE CAROLINE KIRKPATRICK WAGONER, C. WAYNE WHITMAN AND WIFE NANCY H. WHITMAN, BETTY B. HOYT, AND WIFE F. SYLVIA WISEMAN, PETITIONERS V. CITY OF SALISBURY, A NORTH CAROLINA MUNICIPAL CORPORATION, RESPONDENT

No. COA98-1398

(Filed 21 December 1999)

ARQUILLA v. CITY OF SALISBURY

[136 N.C. App. 24 (1999)]

1. **Cities and Towns— annexation—requirements—governmental purposes—subdivision test of urbanization**

The trial court erred in an annexation case by finding that four tracts of land owned by Rowan County and located within Area 1 are in use for governmental purposes and meet the subdivision test of the urbanization requirements under N.C.G.S. § 160A-48(c)(3) because: (1) the listed uses do not establish that the tracts within Area 1 were being used for a common purpose; (2) past uses do not provide evidence that the tracts were supporting governmental uses at the time of annexation; (3) future plans are not relevant for classifying property; (4) the geographical location of the tracts within Area 1 near an airport runway is not evidence that the tracts are in governmental use; and (5) the proper inquiry is the actual use at the time of annexation.

2. **Cities and Towns— annexation—requirements—use of topographic features**

The trial court erred in an annexation case by finding that the boundaries of the pertinent annexation areas follow natural topographic features and streets wherever practical because petitioners met their burden to show that it would have been practical to use topographical features or streets as boundaries, and their burden was not to show that respondent did not have a practical reason to depart from natural features or streets in each instance that it did so.

3. **Cities and Towns— annexation—requirements—use of topographic features**

The trial court erroneously concluded in an annexation case that appellate courts have held that N.C.G.S. § 160A-48(e) is not mandatory because while that statute does not provide mandatory standards or requirements for annexation, the provision itself is mandatory in light of the North Carolina Supreme Court's holding that a boundary must follow topographic features unless to do so would defeat the annexation.

Appeal by petitioners from judgment entered 26 March 1998 by Judge Jerry Cash Martin in Superior Court, Rowan County. Heard in the Court of Appeals 24 August 1999.

*Adams, Hendon, Carson, Crow & Saenger, P.A., by S. J. Crow and Martin K. Reidinger, for petitioners-appellants.*

*Womble, Carlyle, Sandridge & Rice, P.L.L.C., by Roddey M. Ligon, Jr., and Woodson, Ford, Sayers, Lawther, Short, Parrott & Hudson, by F. Rivers Lawther, Jr., for respondent-appellee.*

TIMMONS-GOODSON, Judge.

On 18 February 1997, the City Council of Salisbury adopted two ordinances to annex involuntarily two areas into the corporate limits of the City of Salisbury. Property owners in the areas annexed ("petitioners") challenge the validity of both annexation ordinances. Annexation Area 1 ("Area 1") is generally southwest of the City while Annexation Area 2 ("Area 2") is generally northwest of the City.

The parties dispute whether four tracts of land located within Area 1 were used for governmental purposes and thus subject to involuntary annexation by the City of Salisbury ("respondent"); and whether the boundaries of Area 1 and Area 2 follow natural topographic features or streets whenever practical, thereby meeting legal requirements for annexation boundaries. The trial court affirmed the annexation of Area 1 and Area 2.

Petitioners' evidence at trial tended to show the following. Each of the four tracts within Annexation Area 1 is owned by Rowan County. The tracts in Annexation Area 1 in question are Lot 12, Lot 24, Lot 55 and Lot 187.

Lot 12 consists of 17.37 acres. There are no structures on the wooded lot, nor is there road access. A sewer easement runs along one of its boundaries. However, the sewer line is not in use.

Lot 24 contains 107 acres of land. It is mainly wooded and contains no structures. A road traverses the eastern edge. Part of a closed landfill occupies a small portion of the lot at its northern edge. The landfill has been closed since 1989. While respondent produced evidence at trial that Lot 24 serves to drain airport property, the County Manager testified that he did not consider any of the four tracts to be in use. The County Manager further testified that Lot 24 was being marketed for sale by the County.

Lot 55 is a wooded lot with no structures on it. It consists of 11.22 acres. A road passes through one edge of the lot.

Lot 187 contains 9.23 acres. There are no structures on the property. Some limitations exist regarding the height of any future structures that may be built on Lot 187 due to its proximity to the airport.

In preliminary maps, respondent assessed the use of the tracts in issue and determined that all four were vacant or not in use. In contrast, in the Annexation Ordinance, respondent indicated that the tracts were in use for governmental purposes. Additionally, respondent introduced a map at trial, the Airport Layout Plan ("the Plan"), which portrayed the four tracts in question as part of one overall parcel of land that is being used for governmental purposes.

According to the Plan, this parcel of land, which includes the four tracts in issue, advances the objectives of the County airport in that it serves as a buffer area between airport operations and residential property. Petitioners counter that the Plan is not evidence that the tracts are currently in governmental use, but is instead a map of the County's potential future plans for this parcel of land.

On the boundaries issue, petitioners contend that portions of the boundaries of both Area 1 and Area 2 do not meet legal requirements for the establishment of annexation boundaries in that the lines do not follow natural topographic features or streets whenever practical. As a result, the City cannot provide municipal services to all of the properties that it included in the annexation areas. Petitioners provide two examples of boundaries that allegedly fail to meet legal requirements.

One of the contested boundaries concerns annexed property located in the southwest quadrant of Annexation Area 2, south of Highway 70 and west of Majolica Road. According to petitioners' evidence at trial, respondent followed property lines and private right-of-way lines to set the boundary for the southwest quadrant rather than following natural topographic features or streets. Respondent cannot provide fire protection or sewer services to the southwest quadrant as it is inaccessible by vehicle. The City conceded that it could have set the boundary at Highway 70 and Majolica Road, and that by doing so, it would not have annexed property that it was unable to serve.

Respondent's evidence at trial tended to show that the City made a sincere effort to use natural topographic features and roads where it was deemed to be practical and that the City did use such features and roads in many instances.

Based on the evidence at trial, the court made the following relevant findings of fact:

18. The Petitioners did not contest the classification of properties for use purposes except for the City's classification of all of the property owned by Rowan County, and shown on Petitioners' Exhibit 9 or on Respondent's Exhibit 1 (which is labeled "Airport Layout Plan"), as governmental. The Petitioners contend that the various tax lots or tracts shown on these exhibits should be treated separately with some classified as governmental and others classified as undeveloped in which case they contend that the subdivision test of N.C. Gen. Stat. § 160A-48(c)(3) was not met. The Court finds and concludes that all of the property owned by Rowan County and shown on these exhibits was appropriately classified as governmental, and thus determines that Annexation Area 1 qualifies for annexation by virtue of meeting the subdivision test portion of the urbanization requirements of N.C. Gen. Stat. § 160A-48(c)(3). The land listed on Petitioners Exhibit 9 with Rowan County as owner is properly classified as governmental use pursuant to the holdings in Food Town Stores v. City of Salisbury, 300 N.C. 21, 265 S.E.2d 123 (1980); Lowe v. Town of Mebane, 76 N.C. App. 239, 332 S.E.2d 739 (1985); Adams-Millis Corp. v. Town of Kernersville, 6 N.C. App. 78, 169 S.E.2d 496, cert. denied, 275 N.C. 681 (1969); Thompson v. City of Salisbury, 24 N.C. App. 616, 211 S.E.2d 856 (1975), cert. denied, 287 N.C. 264, 214 S.E.2d 437 (1975); Chapel Hill Country Club v. Town of Chapel Hill, 97 N.C. App. 171, 388 S.E.2d 168 (1990); Shackelford v. City of Wilmington, 490 S.E.2d 578 (1997); and, other cases.

The parcels of land owned by Rowan County and shown on Petitioners' Exhibit 9 and Respondent's Exhibit 1 are lands with a single owner and used for the single purpose of promoting the goals and objectives of the governmental entity Rowan County. The lands owned by the County and shown on the Airport Layout Plan contain: the airport with its runway, taxiways and parking facilities; airport-related buildings; radar facilities; a National Guard Armory with aircraft parking facilities as well as a road serving the Armory; an old animal shelter; three old landfills (with gas exhaust facilities); and, a sewer easement.

The portion of this overall parcel owned by the County that does not have structures on it supports the goals and objectives of the County and its airport and air space in a number of ways.

**ARQUILLA v. CITY OF SALISBURY**

[136 N.C. App. 24 (1999)]

These include: (1) the fact that such property serves as a buffer area between the runway area and adjoining residential properties; (2) a portion of this property was used as a borrow pit to provide dirt for a runway extension; (3) a portion of this property served at one time as a grassy landing strip for small planes; (4) a portion of this property contains a drainage ditch that carries water from the higher runway area to Grants Creek; and, (5) this property cannot be built upon without the County first submitting a form to the F.A.A., and in no event may the property be used in such a way as to interfere with the use of the parcel for airport purposes.

There has been no showing by the Petitioners that the governmental use of this parcel owned by the County was insignificant as compared to any other use.

. . . .

23. In Annexation Area 2, the City attempted to ascertain natural topographic features or streets to use in fixing the new municipal boundaries, and used such features where it was practical to do so, taking into consideration the effect on qualifications and service. In fixing the final proposed boundaries, the City used natural topographic features where practical and where such use did not have an adverse effect upon qualifications and service. The Petitioners presented no evidence that, in each instance where Respondent did not use a natural topographic feature or an actual street for a new municipal boundary, practical reasons did not exist for doing so.

24. To establish non-compliance with N.C. Gen. Stat. § 160A-48(e), regarding natural topographic features, Petitioners must show: (1) that the boundary of the annexed area does not follow natural topographic features or streets; (2) that it would have been practical for the boundary to follow such features; and (3) that the boundaries drawn by the municipality violated the intent of the statute by depriving citizens within the newly annexed area of essential City services. The appellate courts of this State have held that this section of the annexation statute is not mandatory. While some of the boundaries of each of the two (2) annexation areas do not follow natural topographic features or streets, Petitioners have failed to meet the burden of showing that it would have been practical to follow natural topographic features as boundaries; that to have done so would not have defeated the

overall annexation plan, and that the boundaries drawn by the City violated the intent of the statute by depriving citizens within the newly annexed area of essential City services.

Based on the findings of fact, the court made the following pertinent conclusions of law:

19. The method used by the City to determine the classification of the property located in Annexation Area 1, including the classification of the property owned by Rowan County and shown on Petitioners' Exhibit 9 and its Airport Layout Plan (Respondent's Exhibit 1), as governmental was calculated to provide reasonably accurate results. Area 1 meets the subdivision test portion of the urbanization requirements of the General Statutes and thus complies with the urbanization requirements of N.C. Gen. Stat. § 160A-48(c)(3).

. . . .

25. The boundaries of Annexation Area 2 comply with the provisions of N.C. Gen. Stat. § 160A-48(e).

Petitioners appeal.

_____

The issues presented by this appeal are whether the trial court erred (I) in finding that four tracts of land located within Area 1 are in use for governmental purposes; and (II) in finding that the boundaries of Area 1 and Area 2 follow natural topographic features and streets wherever practical.

The hearing was before a judge sitting without a jury. Findings of fact of the trial court are conclusive on appeal if supported by any competent evidence, even if there is evidence to the contrary. *Humphries v. City of Jacksonville*, 300 N.C. 186, 187, 265 S.E.2d 189, 190 (1980) (citation omitted). Conclusions of law are reviewable *de novo*. *Id.* Where there is *prima facie* evidence that a municipality has complied with the annexation statute, and a party appeals from the adoption of an annexation ordinance, the party attacking the annexation has the burden to show by competent evidence that the municipality failed to meet the statutory requirements. *Dale v. Morganton*, 270 N.C. 567, 574, 155 S.E.2d 136, 143 (1967) (citation omitted).

I.

[1] In their first assignment of error, petitioners argue that the trial court erred by finding that four tracts of land owned by Rowan

County and located within Area 1 are in use for governmental purposes. Petitioners contend that there was insufficient evidence of governmental use on said tracts; therefore, respondent City had no right to involuntarily annex the land. We agree.

An area may not be involuntarily annexed unless it is developed for urban purposes. N.C. Gen. Stat. § 160A-48(c) (Cum. Supp. 1998). According to the "subdivision test" of North Carolina General Statutes section 160A-48(c)(3), an area is sufficiently urbanized if "at least sixty percent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes[.]" N.C.G.S. § 160A-48(c)(3).

Respondent argues that the tracts in issue were in governmental use at the time of annexation; therefore, the tracts met the "subdivision test" of North Carolina General Statutes section 160A-48(c)(3) and were properly found to qualify for involuntary annexation. If, on the other hand, the tracts were not properly classified as in governmental use, then Area 1 does not meet the "subdivision test" and this annexation must fail.

As indicated by North Carolina General Statutes section 160A-48(c)(3), the use of property determines whether it may be involuntarily annexed. *See R.R. v. Hook*, 261 N.C. 517, 135 S.E.2d 562 (1964). In contrast, ownership of the property is not the relevant inquiry. *Id.* (holding the trial court improperly classified a thirteen acre tract as industrial where the entire tract was owned by a corporation but only one acre was being used by the corporation as a parking lot at the time of annexation).

Finding of Fact Number 18 by the trial court treats the issue of use classification of Area 1. Within Finding of Fact 18, the trial court indicates seven times that the property is owned by Rowan County. Since the use of the property at the time of annexation is the proper inquiry, county ownership of the property cannot support the conclusion that "Area 1 meets the subdivision test portion of the urbanization requirements of the General Statutes and thus complies with the urbanization requirements of N.C. Gen. Stat. § 160A-48(c)(3)."

Our Supreme Court also indicated in *Hook* that future plans for use are not relevant in determining whether property may be involuntarily annexed. The fact that the property in *Hook* was "being held for possible industrial use at some indefinite future time" did not sig-

nify that the property was industrially used. *Id.* at 520, 135 S.E.2d at 565. "[A]ctual, minimum urbanization is an essential requirement of the annexation act." *Thrash v. City of Asheville*, 327 N.C. 251, 257, 393 S.E.2d 842, 846 (1990). "The City's subdivision test calculations must reflect actual urbanization, not reliance on some artificial means of making an annexation appear urbanized." *Asheville Industries, Inc. v. City of Asheville*, 112 N.C. App. 713, 719, 436 S.E.2d 873, 877 (1993) (citing *Thrash*, 327 N.C. 251, 393 S.E.2d 842).

Petitioners argue that the trial court improperly relied on the Airport Layout Plan, respondent's Exhibit 1, in classifying the property as governmental. According to petitioners, the Plan is a planning map, depicting how the property in Area 1 may potentially be used in the future. Before we determine whether Area 1 met the subdivision test, we must ascertain as a preliminary matter whether the Plan "reflect[s] actual urbanization" or is merely "some artificial means of making an annexation appear urbanized." *Id.*

Clearly, the trial court relied on the Plan in determining that Area 1 was in governmental use. Within Finding of Fact Number 18, the trial court refers to the Plan numerous times, stating that "[t]he land listed on [the Plan] is properly classified as a government use . . . ." Additionally, the trial court concludes that "[t]he method used by the City to determine the classification of the property located in Annexation Area 1, including the classification of the property . . . shown on [the Plan] as governmental was calculated to provide reasonably accurate results."

By relying on the Plan, the trial court rejected petitioners' argument that the various lots within Area 1 should be treated separately with some classified as governmental and others classified as undeveloped. Instead, the Plan depicted the four tracts in issue as part of one overall parcel of land that was being used for governmental purposes.

We now address the issue of whether the trial court's reliance on the Plan in its findings of fact was supported by competent evidence. A municipality must use "methods calculated to provide reasonably accurate results" to determine whether property meets the subdivision test. N.C. Gen. Stat. § 160A-54 (Cum. Supp. 1998). The trial court cites the following cases in Finding of Fact Number 18 in support of its classification based on the Plan: *Food Town Stores v. City of Salisbury*, 300 N.C. 21, 265 S.E.2d 123 (1980); *Lowe v. Town of Mebane*, 76 N.C. App. 239, 332 S.E.2d 739 (1985); *Adams-Millis Corp.*

*v. Kernersville*, 6 N.C. App. 78, 169 S.E.2d 496, *cert. denied*, 275 N.C. 681 (1969); *Thompson v. City of Salisbury*, 24 N.C. App. 616, 211 S.E.2d 856, *cert. denied*, 287 N.C. 264, 214 S.E.2d 437 (1975); *Chapel Hill Country Club v. Town of Chapel Hill*, 97 N.C. App. 171, 388 S.E.2d 168, *disc. review denied*, 326 N.C. 481, 392 S.E.2d 87 (1990); and *Shackelford v. City of Wilmington*, 127 N.C. App. 449, 490 S.E.2d 578 (1997). We note that this Court's decision in *Shackelford* has no precedential value in light of the *per curiam* vote of 3-3 in *Shackelford v. City of Wilmington*, 349 N.C. 222, 505 S.E.2d 80 (1998), and therefore do not rely on it in our analysis.

The above mentioned cases stand for the proposition that individual lots may be treated as a single tract for purposes of classification in annexation cases under certain circumstances. *Food Town Stores, Lowe* and *Adams-Millis* cite a two-prong test consisting of common ownership and common purpose. "In appraising an area to be annexed one of the methods which can be used to determine what is a tract is to consider several lots in single ownership used for a common purpose as being a single tract." *Lowe*, 76 N.C. App. at 242, 332 S.E.2d at 742.

*Thompson* and *Chapel Hill Country Club* both hold that the lots which make up a golf course may be treated as one tract as the entire course is in commercial or industrial use. *Thompson* and *Chapel Hill Country Club* are of dubious applicability in the case at bar except as they provide support for the obvious proposition that if the lots within a tract are found to be in governmental use, then the overall tract may be classified as in governmental use.

As indicated by the cases cited in Finding of Fact Number 18, tracts of land serve a common governmental purpose where they are in governmental use or they actively support governmental use. For example, in *Food Town Stores*, our Supreme Court found that four tracts, A, B, C and D, served a common industrial purpose where tracts A and B actively supported industrial improvements on tracts C and D. A and B supported industrial use on C and D in that: a sediment basin on B controlled erosion on C and D, B was the source of fill material for construction on C and D, employee parking facilities on C had expanded into A, and fill for C and D was taken from the boundary of A.

In the present case, the tracts within Area 1 served a common purpose if the four tracts in issue, Lot 12, Lot 55, Lot 187 and Lot 24, were in governmental use or supported governmental use on other

tracts within Area 1 at the time of annexation. Finding of Fact Number 18 states that the lots serve "the single purpose of promoting the goals and objectives of the governmental entity Rowan County." In support of this vague statement of purpose, the trial court makes the following findings:

> The lands owned by the County and shown on the Airport Layout Plan contain: the airport with its runway, taxiways and parking facilities; airport-related buildings; radar facilities; a National Guard Armory with aircraft parking facilities as well as a road serving the Armory; an old animal shelter; three old landfills (with gas exhaust facilities); and, a sewer easement.

The above uses do not establish that the tracts within Area 1 were being used for a common purpose. The majority of the stated uses did not take place on the four tracts in issue, and therefore, are not evidence that the four tracts were in governmental use or supported governmental use on other property within Area 1. For example, the airport with its runway, taxiways and parking facilities are not located on any part of Lot 12, Lot 55, Lot 187 or Lot 24. Similarly, there are no airport-related buildings on the lots in issue, nor are there radar facilities, a National Guard Armory or aircraft parking facilities. Past uses, such as "an old animal shelter" and "old landfills" do not provide evidence that the tracts were supporting governmental uses at the time of annexation. See Thrash, 327 N.C. 251, 393 S.E.2d 842.

Respondent presented evidence that there was a sewer easement for a single sewer line on one of the boundaries of Lot 12. However, the sewer line was not connected and the County made no use of it. Aside from the sewer line, Lot 12, consisting of 17.37 acres, was wooded, vacant and contained no structures. We conclude that the governmental use on Lot 12 was insignificant when compared to the use of the tract as a whole. See Asheville Industries, Inc., 112 N.C. App. 713, 436 S.E.2d 873 (holding that the industrial use of a property was insignificant as compared to the nonindustrial use where the property was crossed by an industrial power line from a nearby electric generating plant).

Additionally, respondent presented evidence that a road passes through one edge of Lot 55. Otherwise, Lot 55, consisting of 11.22 acres, is overgrown with bushes and trees. Respondent labeled the entire Lot 55 as in governmental use because "[i]t's suitable for airport buildings and facilities[.]" Future plans are not relevant for clas-

ARQUILLA v. CITY OF SALISBURY

[136 N.C. App. 24 (1999)]

sifying property. *See Hook*, 261 N.C. 517, 135 S.E.2d 562. We conclude that the actual governmental use on Lot 55 at the time of annexation was insignificant as compared to the nongovernmental use. *See Asheville Industries, Inc.*, 112 N.C. App. 713, 436 S.E.2d 873.

Additionally, the trial court cited the following uses in support of its finding that the tracts within Area 1 served a common purpose:

> The portion of this overall parcel owned by the County that does not have structures on it supports the goals and objectives of the County and its airport and air space in a number of ways. These include: (1) the fact that such property serves as a buffer area between the runway area and adjoining residential properties, (2) a portion of this property was used as a borrow pit to provide dirt for a runway extension; (3) a portion of this property served at one time as a grassy landing strip for small planes; (4) a portion of this property contains a drainage ditch that carries water from the higher runway area to Grants Creek; and (5) this property cannot be built upon without the County first submitting a form to the F.A.A., and in no event may the property be used in such a way as to interfere with the use of the parcel for airport purposes.

Again, we find that the above uses fail to establish that the tracts within Area 1 were being used for a common purpose. The second and third uses must be disregarded as they pertain to past activities. *See Thrash*, 327 N.C. 251, 393 S.E.2d 842. Turning to the fourth use, while respondent presented evidence that Lot 24 served to drain airport property, Lot 24 was being actively marketed for sale by the County. Clearly, Lot 24 was not supporting governmental use if the County sought to sell it.

Regarding the fifth above mentioned use, respondent put on evidence that Lot 187 is limited by Federal Aviation Administration regulations as to the height of buildings that may be constructed on it. However, a height limitation is not evidence of a current governmental use. Lot 187 could potentially be developed for residential use or industrial use without violating the height restriction. At the time of annexation, Lot 187 contained no structures of any kind and was not in governmental use or supporting governmental use.

Finally, the trial court indicated that the property within Area 1 serves a common purpose in that it acts as a buffer area between the runway area and adjoining residential properties. We are not con-

vinced that the property within Area 1 serves or supports a governmental purpose merely because it is in proximity to the airport runway. Property surrounding an airport can be developed for nongovernmental uses. The geographical location of the tracts within Area 1 is not evidence that they are in governmental use.

In the present case, while the evidence supports a finding of common ownership, there is insufficient evidence that the lots served a common purpose. *See Food Town Stores*, 300 N.C. 21, 265 S.E.2d 123; *Lowe*, 76 N.C. App. 239, 332 S.E.2d 739; *Adams-Millis Corp.*, 6 N.C. App. 78, 169 S.E.2d 496. The County treated the tracts within Area 1 as separate tax lots. Lot 24 was being marketed for sale by the County as a separate parcel. In its urbanization calculations, respondent treated each tax parcel as a separate tract. In preliminary maps, respondent assessed the use of the individual tracts in issue and determined that all four were vacant and not in use.

Having determined that there was insufficient evidence that the lots within Area 1 served a common purpose at the time of annexation, we conclude that the trial court erred in treating them as a single tract. *See Lowe*, 76 N.C. App. at 242, 332 S.E.2d at 742. In light of the particular circumstances, the Plan was not a reasonable method of determining whether Area 1 met the subdivision test. *See Id.* Therefore, the trial court's conclusion of law that "[t]he method used by the City to determine the classification of the property located in Annexation Area 1 . . . was calculated to provide reasonably accurate results" is not supported by the findings of fact.

We agree with petitioners' contention that the Plan is in essence a planning map, depicting how the property in Area 1 may be used in the future. Rowan County Manager Tim Russell testified that the Plan "shows you the airport and potential development around the airport[.]" Russell further testified that the Plan includes additions to the existing development. For instance, the Plan depicts structures on Lot 55 which do not actually exist.

As discussed above, future plans for use are irrelevant in determining whether a property may be involuntarily annexed. Instead, the proper inquiry is the actual use at the time of annexation. Therefore, the fact that the four tracts in issue appear on the Plan does not support the conclusion that "Area 1 meets the subdivision test portion of the urbanization requirements of the General Statutes and thus complies with the urbanization requirements of N.C. Gen. Stat. § 160A-48(c)(3)."

The trial court did not make findings of fact regarding each tract, but instead made a blanket finding based on the Plan that the properties were properly classified as in governmental use. As the trial court did not make findings as to actual governmental use on the four lots at the time of annexation, we find no support for the conclusion of law that "Area 1 meets the subdivision test portion of the urbanization requirements of the General Statutes and thus complies with the urbanization requirements of N.C. Gen. Stat. § 160A-48(c)(3)." We conclude that the annexation of Area 1 was improper and therefore reverse.

## II.

**[2]** In their second assignment of error, petitioners argue that the trial court erred by finding that the boundaries of Annexation Areas 1 and 2 follow natural topographic features and streets wherever practical. Having already determined that the involuntary annexation of Area 1 was improper, we confine our analysis to Area 2. The contested boundaries concern annexed property located in the southwest quadrant of Area 2, south of Highway 70 and west of Majolica Road. Petitioners argue that respondent impermissibly followed property lines and private right of way lines to set the boundary for the southwest quadrant rather than following natural topographic features or streets. We agree.

Whenever practical, a municipal governing board must follow "natural topographic features such as ridge lines and streams and creeks as boundaries, and may use streets as boundaries." N.C. Gen. Stat. § 160A-48(e) (1994). *See also* N.C. Gen. Stat. § 160A-36(d) (1994). Petitioners have the burden to show: "(1) that the boundary of the annexed area does not follow natural topographic features, and (2) that it would have been practical for the boundary to follow such features." *Greene v. Town of Valdese,* 306 N.C. 79, 82, 291 S.E.2d 630, 633 (1982).

In *Greene,* the petitioners presented no evidence that it would have been practical or reasonable to follow topographic features. In contrast, the respondent put on evidence that it would not have been practical to follow such features because to do so would have included an expanse of undeveloped land, thereby defeating the annexation. Our Supreme Court held that a municipality must follow natural features unless to do so would defeat the annexation.

Where the boundary of the annexed area . . . can be established along [natural topographic features] without defeating the area's

compliance with the other portions of G.S. 160A-36 the boundary must follow such features. Where, however, to follow natural topographic features would convert an area which would otherwise meet the statutory tests . . . into an area that no longer satisfies those requirements, the drawing of boundaries along topographic features is no longer "practical[.]"

*Id.* at 85, 291 S.E.2d at 634. *See also Matheson v. City of Asheville,* 102 N.C. App. 156, 402 S.E.2d 140 (1991) (finding that City was not required to extend annexation boundaries to natural ridgelines where to do so would have defeated City's compliance with urbanization requirements).

In the present case, petitioners met their burden of showing that the boundary of Area 2 fails to follow natural topographic features, and that it would have been practical for the boundary to follow such features. Heidi Galanti, Senior Planner in the City Planning Department, testified that a portion of Area 2 followed property lines and not natural topographic features or streets:

Q: Now, if you can direct your attention to Area 2, there is a portion at the western boundary of Area 2 where the boundary simply follows property lines. Is that correct?

A: That is correct.

Petitioners contend that a practical alternative was available to respondent in that respondent could have set the boundary at Highway 70 and Majolica Road, thereby excluding the southwest portion of Area 2. At trial, Galanti conceded that the City could have used the highway as a boundary and that by doing so, respondent would have improved its chances of complying with statutory urbanization requirements. Furthermore, Galanti testified that using the street as a boundary would have made it possible for the City to provide municipal services to the entire annexation area.

Q: In light of the services that you are going to be unable to provide to this portion of Area 2, would it not have been more practical for the boundary to continue to follow Highway 70 down here?

A: I don't know. I would say that—no.

Q: At least you would be able to provide services to the whole area rather than just three-quarters of the area, wouldn't you?

A: Under those situations, I guess.

. . . .

Q: You say eliminating this portion of Area 2 would improve your percentage for qualifying Area 2 as urbanized. Correct?

A: It probably would have raised those numbers, yes.

In *Greene* and *Matheson*, following natural features or streets would have forced the City to include more land within the boundaries of the annexed area, thereby defeating the urbanization requirement for annexation. In contrast, in the present case, if respondent had followed natural features or streets it would have included less land in the annexed area and improved the chances that Area 2 would qualify for annexation.

We agree with respondent that the annexation of Area 2 is not null and void under the principles enunciated in *Weeks v. Town of Coates*, 121 N.C. App. 471, 466 S.E.2d 83 (1996). In *Weeks*, this Court held that an annexation ordinance was null and void where there was no *prima facie* evidence that the town attempted to comply with North Carolina General Statutes section 160A-36(d). In the present case, Galanti testified for respondent that "[w]henever there were topographic features that were practical to be used, they were used." Galanti also indicated that a sincere effort was made to use natural topographic features whenever practical. The testimony of Galanti constitutes *prima facie* evidence that respondent attempted to comply with the statutory requirements. Therefore, the decision in *Weeks* does not control. Rather, the applicable decisions by this Court are: *Lowe*, 76 N.C. App. 239, 332 S.E.2d 739, and *Rexham Corp. v. Town of Pineville*, 26 N.C. App. 349, 216 S.E.2d 445 (1975). *Weeks*, 121 N.C. App. at 476, 466 S.E.2d at 86.

In *Lowe*, this Court relied on the two-part test announced in *Greene*. Additionally, the *Lowe* court remarked on the legislative history of section 160A-36(d), which suggests that "the Legislature was concerned that a full range of municipal services be available to citizens in the annexed area." *Lowe*, 76 N.C. App. at 244, 332 S.E.2d at 743. This Court concluded in *Lowe* that boundary lines conformed with the requirements of section 160A-36(d) where the Town did not include developed land on both sides of the streets which served as boundaries.

Petitioners have failed to carry their burden of showing that it would have been practical to follow natural topographic features

as boundaries, that to do so would not have defeated the overall annexation plan, and that the boundaries drawn by the town violated the intent of the statute by depriving citizens within the newly annexed area of essential city services.

*Id.*

In the case *sub judice*, we have already concluded petitioners have shown that it would have been practical for respondent to follow natural features and that it would not have defeated the overall annexation plan had respondent done so. Additionally, petitioners put on evidence that the City would be unable to provide essential municipal services within Area 2. Heidi Galanti, Senior Planner in the City Planning Department, testified as follows:

Q: You were made aware that sewer service could only be provided to that portion of Area 2 with a pump installation. Correct?

A: At some point I believe I was.

Q: And you are aware, are you not, that the sewer plans for Area 2 do not include that pump station? Are you aware of that?

A: Yes, I am.

Q: So you are aware that that portion of Area 2 that was ultimately included in the annexation area does not have services proposed for it because the pump station wouldn't be put in. Correct?

A: Correct.

Q: Now, there are some roads that give access to this back portion, southwestern corner, of Area 2. Is that correct?

A: Not that I'm aware of.

Q: So for the fire department to put out a fire in this portion of Area 2, they would need a brush truck, or at least some form of off-road fire extinguishing apparatus to put out a fire in that area, wouldn't they?

A: That would be my assumption.

Q: I believe you heard Chief Brady testify the city department does not have any such brush truck. Correct?

A: Correct.

The trial court's Conclusion of Law Number 24 reveals that the trial court relied on the test enunciated in *Lowe*.

> 24. . . . Petitioners have failed to meet the burden of showing that it would have been practical to follow natural topographic features as boundaries; that to have done so would not have defeated the overall annexation plan, and that the boundaries drawn by the City violated the intent of the statute by depriving citizens within the newly annexed area of essential City services.

We do not find support in the findings of fact for the above conclusion. The only finding regarding petitioners' burden is within Finding of Fact Number 23 and states: "Petitioners presented no evidence that, in each instance where Respondent did not use a natural topographic feature or an actual street for a new municipal boundary, practical reasons did not exist for doing so." The finding misstates petitioners' burden. As *Greene* and *Lowe* indicate, petitioners had the burden to show that it would have been practical to use topographic features or streets as boundaries. Petitioners did not, as the trial court suggests, have the burden to show that respondent did not have a practical reason to depart from natural features or streets in each instance that it did so. Believing that petitioners met their burden, we hold that the trial court's conclusion of law is in error.

[3] We also note that the trial court erroneously concluded that "appellate courts of this State have held that [G.S. 160A-48(e)] is not mandatory." In *Greene*, our Supreme Court stated that "the provisions of subsection (d) of G.S. 160A-36 contain no mandatory standards or requirements for annexation." *Greene*, 306 N.C. at 85, 291 S.E.2d at 634. The Court made this statement in support of its holding that a municipality may depart from topographic features in drawing boundaries where it would be impractical or "not possible of reasonable performance" to adhere to such features (internal quotations omitted). *Id.* While section 160A-48(e) does not provide "mandatory standards or requirements for annexation," we believe that the provision itself is mandatory in light of our Supreme Court's holding that a boundary "must" follow topographic features unless to do so would defeat the annexation. *Id.* Therefore, the trial court erred in so concluding.

For the reasons stated herein, the judgment of the trial court affirming both annexation ordinances is reversed.

Reversed.

Judges GREENE and HORTON concur.